# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 14-781


**JEROME SMITH**

**VERSUS**

**LEXINGTON INSURANCE COMPANY, ET AL.**


\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
ALEXANDRIA CITY COURT
PARISH OF RAPIDES, NO. 125,678
HONORABLE RICHARD ERIC STARLING, JR., CITY COURT JUDGE

\*\*\*\*\*\*\*\*\*\*

## JOHN D. SAUNDERS
## JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of John D. Saunders, Elizabeth A. Pickett, and John E. Conery, Judges.


**AFFIRMED.**


**George Arthur Flournoy**
**Flournoy, Doggett & Losavio**
**P. O. Box 1270**
**Alexandria, LA 71309-1270**
**(318) 487-9858**
**COUNSEL FOR PLAINTIFF/APPELLANT:**
　　**Jerome Smith**

**Randall M. Seeser**
**Gold, Weems, Bruser, Sues & Rundell**
**P.O. Box 6118**
**Alexandria, LA 71307-6118**
**(318) 445-6471**
**COUNSEL FOR DEFENDANT/APPELLEE:**
**Dr. Jay Piland**

**SAUNDERS, Judge**

This is a medical malpractice case. Plaintiff, Jerome Smith (hereafter "Appellant") appeals the judgment of the trial court finding that Appellant did not prove that treatment rendered by Jay Piland, M.D. (hereafter "Appellee") caused injury to him by a preponderance of the evidence. For the following reasons, we affirm.

**FACTS AND PROCEDURAL HISTORY**

On April 11, 2007, Appellant was admitted to Crossroads Regional Hospital for depression and threats to harm himself and others. Appellant had a significant medical history, including chronic paranoid schizophrenia, depression, homicidal and suicidal ideations, and a history of alcohol abuse. It was documented that Appellant reported suffering from auditory and visual hallucinations. Appellant tested positive for cocaine upon admission, although he denied using it when confronted.

Appellee served as the Medical Director of Crossroads and performed a medical history and physical consultation on April 11, 2007, during which he discovered a foreign body in Appellant's right ear. Appellee removed the foreign body on April 12, 2007. Appellant contends that, during the removal of the foreign body, Appellee punctured his tympanic membrane. It is this assertion that forms the basis of the instant matter.

Appellant timely submitted his claims against Appellee to a medical review panel. The panel issued an opinion dated August 24, 2010, finding Appellee had not breached the standard of care in his treatment of Appellant. Thereafter, on October 6, 2010, Appellant filed a petition for damages against Appellee.

On July 29, 2013, a bench trial was held on the merits. Written reasons for judgment were issued on November 29, 2013. In its reasons for judgment, the trial

court found that the Appellant failed to prove by a preponderance of the evidence that Appellee had perforated Appellant's right eardrum. On December 10, 2013, judgment was rendered in Appellee's favor dismissing Appellant's claims. In his appeal, Appellant asserts that the trial court erred in finding that Appellant "punctured his own eardrum prior to his admission to Crossroads on April 11, 2007." For the reasons articulated below, we affirm the judgment of the trial court.

**STANDARD OF REVIEW**

"An appellate court may not set aside a trial court's finding of fact absent manifest error or unless it is clearly wrong." *Succession of Moss*, 00–62, p. 3 (La.App. 3 Cir. 6/21/00), 769 So.2d 614, 617, *writ denied*, 00–2834 (La. 12/8/00), 776 So.2d 462 (citing *Rosell v. ESCO*, 549 So.2d 840 (La.1989)). As our supreme court explained in *Stobart v. State through Department of Transportation & Development*, 617 So.2d 880, 882-83 (La.1993)(citations omitted):

> This court has announced a two-part test for the reversal of a factfinder's determinations:
>
> 1) The appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and
> 2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous).
>
> This test dictates that a reviewing court must do more than simply review the record for some evidence which supports or controverts the trial court's finding. The reviewing court must review the record in its entirety to determine whether the trial court's finding was clearly wrong or manifestly erroneous.
>
> Nevertheless, the issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Even though an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. . . . this Court has emphasized that "the reviewing court must always keep in mind that 'if the trial court or jury's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced

2

that had it been sitting as the trier of fact, it would have weighed the evidence differently.'"

The trial court found that "[Appellant] simply could not prove by a preponderance of the evidence that his right eardrum was perforated by the treatment of [Appellee]. The court believes it is just as likely that [Appellant] caused this injury." To warrant reversal, Appellant must show the trial court's conclusion was not "reasonable in light of the record reviewed in its entirety," and, therefore, was manifestly erroneous.

**BURDEN OF PROOF**

Louisiana Revised Statutes 9:2794 provides, in pertinent part:

A. In a malpractice action based on the negligence of a physician . . . the plaintiff shall have the burden of proving:

(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians . . . in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians . . . within the involved medical specialty.

(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.

In *Fusilier v. Dauterive*, 00-151, p. 7 (La. 7/14/00), 764 So.2d 74, 79, the supreme court explained a medical malpractice plaintiff's burden of proof, as established by La.R.S. 9:2794:

In a medical malpractice action, the plaintiff has the burden of proving, by a preponderance of the evidence, (1) that the doctor's treatment fell below the standard of care expected of a physician in his medical specialty; and (2) the existence of a causal relationship between the alleged negligent treatment and the injury sustained.

Given the applicable statute, Appellant had the burden to establish the standard of care required of Appellee, to prove by a preponderance of the evidence

that Appellee failed to meet that established standard of care, and to prove that the injury he suffered was causally connected to Appellee's failure to meet the established standard of care. The trial court found that Appellant did not prove by a preponderance of the evidence that Appellee punctured his eardrum. Therefore, we must determine whether the record, viewed in its entirety, contains a reasonable basis for the trial court to reach this conclusion.

**DISCUSSION**

Appellee performed a medical consultation on April 11, 2007, which included an examination of Appellant's ears. During this examination, a foreign body was discovered in Appellant's right ear.

**Causation**

In his consultation summary, Appellee noted: "Right ear foreign body secondary to cotton swab" and ordered removal of the foreign body with a curette. He reexamined Appellant on April 12, 2007 and "noted excessive amounts of cerumen and debris in the approximate middle third of the ear canal." Additionally, Appellee testified that there was excess exudate in the middle third of the ear canal and inflammation throughout. Appellee explained that exudate "com[es] from [a] type of wound or an inflammatory process."

Appellee further testified that he performed the extraction of the foreign body in the outer to middle third of the ear. Although he was able to remove "just a small wisp of cotton and little bit of the exudate," he was unable to "extract the whole foreign body." Instead, Appellee explained: "It was more of a very small piece of what would probably be, you know, extra, more to it, I mean there was just a little wisp of it attached to the exudate and the loop--." The procedure was terminated due to Appellant's agitation.

Regarding the amount of forced used, Appellee testified:

Q.      What about the actual performance of the procedure, what kind of force was used in relation to the curette and [Appellant's] ear?

A.      Again I tend to go above and then scoop behind, you know, it is a loop. There are spoons and those sort of things that are real firm where you really have to literally would have to poke through cerumen and this is you know sort of designed to gently, as he would say, scrape but you know remove the cerumen from the outer canal, that is why it is so soft and generally that is pretty well tolerated in most individuals with a cerumen build up.

He further testified that he did not dig into Appellant's ear, that he did not see any blood during the procedure, which is something he would have noted, and that it was not unusual for a patient to express some discomfort during cerumen extraction.

Additionally, Appellee explained that there are multiple possible causes of a punctured tympanic membrane, including, "foreign body insertion, a sharp instrument of any kind, even a dull instrument for that matter if it is rigid like a q-tip . . . ."

On April 17, 2007, a medical consult was requested to evaluate Appellant for elevated blood pressure.  Andrew Benoit, FNP[1], (hereafter "Nurse Benoit"), who assisted Appellee in performing his medical duties at Crossroads, examined Appellant on April 18, 2007, following the consultation request.  During the examination, Appellant complained of pain in his right ear.  Nurse Benoit examined Appellant's right ear.  Regarding his examination of Appellant's right ear, he testified:

A.      Reference was, like I said earlier, either recent or recurrent ear foreign object.  Quote cotton from q-tip.

Q.      Did you note any cotton?

A.      No sir.

---

[1] FNP is an abbreviation for Family Nurse Practitioner.

5

Q.    The next finding is what?

A.    I put currently no cotton noted but appears to have two punctures and t.m. with inflamation [sic] and significant pain.

Q.    Okay, did you diagnose two punctures of the tympanic membranes on April the eighteenth two thousand seven?

A.    No sir.

Q.    How did you describe them?

A.    Well the appearance, you know, I put appeared to have two punctures.

Q.    And what is the significance of the use, appears to have?

A.    Well because there can be, sort of, you can have instances where you have the appearance of a TM. perforation and it may not be a perforation, it may a retraction pocket or perhaps, I have seen before where you can have actually a little water bubble on an ear drum that can look a little inverted rather than appear to be a bubble. It can appear exactly as a perforation. You can have a prior perforation that has been healed over and the inverted rather than appear to be a bubble. It can appear exactly as a perforation. You can have a prior perforation that has been healed over and the membrane is more clear, almost like a cellophane and it can appear to be a perforation when there is actually a membrane there and so appearance of a perforation is not diagnostic for me, maybe for ENT.'s visualization but you know from my perspective I wouldn't diagnose it. I would like for a specialist to see it to either rule it in or rule it out.

Nurse Benoit further testified:

Q.    If you had diagnosed a puncture of the tympanic membranes would your documentation have been any different?

A.    Usually if you have, if you know you have a perforation, I have been taught that you want to identify based sort of on the clock system. Sort of identify the size, approximate size of the perforation and sort of which position it is relative to the face of a clock.

Q.    And did your documentation contain any of that?

A.    No sir.

Q.    And why not?

A.    Well I wasn't sure if it was a perforation or not just wanted to find out.

Nurse Benoit then changed Appellant's medication to ciprodex "in case there was a puncture." Significantly, Nurse Benoit did not diagnose a perforated tympanic membrane at the time of his consult. Instead, he noted that there was what appeared to be a puncture to Appellant's tympanic membrane, but explained there were other possible diagnoses. A final diagnosis required the consultation of a specialist. Nurse Benoit also explained, "anything you can put in the ear could potentially puncture an eardrum."

L.M. Warshaw, M.D. (hereafter "Dr. Warshaw"), who was tendered as an expert in otolaryngology, examined Appellant on April 23, 2007 and April 30, 2007. He testified that, on April 23, 2007, Appellant complained of a punctured right eardrum, decreased hearing, ringing in his ear, pain and drainage.

Upon examination on April 23, 2007, Dr. Warshaw discovered that Appellant had cotton and cerumen in his right ear. Dr. Warshaw testified that he removed the cotton and that he was unable to visualize Appellant's tympanic membrane, because he "[s]till had a lot of debris in the ear." Appellant returned on April 30, 2007. Upon examination on April 30, 2007, Dr. Warshaw discovered that Appellant then had cotton in his left ear.

Concerning whether Appellant suffered from a punctured tympanic membrane, Dr. Warshaw testified:

Q.    So it's safe for me -- well, is it true, then, that at no time did you diagnose this patient to with perforated tympanic membranes?

A.    No.

Q.    And in fact, you have objective evidence that he did not have that on April 30th, 2007?

7

A. On April 30th, there's objective evidence he did not have a tympanic membrane perforation.

Concerning whether the use of a curette to remove a foreign body from the ear canal could cause a puncture to the tympanic membrane, Dr. Warshaw explained: "Anytime you, put anything in the ear you could puncture the eardrum."

Appellant testified that, when he was admitted to Crossroads, he had a piece of cotton in his ear, which had gotten placed in his ear canal when he used a cotton swab to clean ear wax out of his ear approximately one week prior to his admission to Crossroads. He further testified that he had inserted cotton swabs into his ears for "a good portion . . . [of] my time." He also explained that, upon admission to Crossroads, he had "some" buildup of ear wax in his ear. Finally, regarding Dr. Warshaw's finding of the second foreign body in his left ear, Appellant testified:

Q. How did a foreign body get in your left ear at Crossroads?

A. That I don't even recall that portion. I don't recall that at all, I'm gonna be honest with you about that. I don't recall something being, another foreign body, but if it was, a little piece of cotton it was because I dig in my ear you know with a little bit of cotton. I don't punch in my ear. I dig in it to get the little wax out, that is it.

Appellant relies on evidence in the record indicating that Appellant reported complaints of ear pain only after the April 12, 2007 procedure was performed by Appellee for the assertion that the trial court's finding was erroneous. While this evidence may establish that Appellant did not experience pain until after the April 12, 2007 procedure, it does not establish that Appellee punctured his eardrum during the procedure. It is equally as likely that the pain developed as a result of foreign body remaining in Appellant's ear canal for approximately one week prior to his admission to Crossroads.

Given the above testimony, we find the evidence supports the trial court's conclusion "that there had to be problems with [Appellant's] ear which *could have*

very well included a ruptured eardrum at the time of his admission to Crossroads." We also find the record supports the trial court's conclusion that Appellant may have injured his own eardrum. Appellant's testimony concerning the insertion of foreign objects into his ear, both prior to and during his stay at Crossroads, together with the testimony of multiple physicians that insertion of any foreign object could cause a perforation to the tympanic membrane, viewed against Appellant's psychological history and denial of cocaine use, amply supports the trial court's conclusion "it is just as likely that [Appellant] caused this injury." Accordingly, we find that the trial court's decision is supported by the record, and, thus, is not manifestly erroneous or clearly wrong.

### Standard of Care

In brief, Appellant argues that Appellee's treatment of him fell below the ordinary standard of care. In support of this argument, he asserts that all of the "[a]ll the doctors agreed that, if a curette is used improperly, a perforated eardrum could result." This reliance is misplaced. As multiple physicians explained, insertion of *any* object into the ear canal *could* perforate a patient's tympanic membrane. However, none of the medical professionals testified that Appellee breached the ordinary standard of care in removing the cotton swab on April 12, 2007. Instead, all testifying physicians testified that the removal was performed within the applicable standard of care.

Dr. Warshaw testified that the curette used by Appellee was an appropriate tool to perform the procedure and that the performance of that procedure, as described by Appellee, was within the applicable standard of care. Moreover, Daniel Renois, M.D., a family practice physician and member of the medical malpractice review panel testified:

9

Q. In your opinion, did Dr. Piland's performance of the procedure on April twelfth two thousand seven comply with the applicable standard of care?

A. Yes sir.

Q. Alright you are aware that Dr. Piland used a curette?

A. Yes sir.

. . . .

Q. . . . . Are you familiar with that instrument?

A. Yes sir I use the same one.

Q. And it would be, would it be appropriate for Dr. Piland to use that instrument in performing the procedure he did on April twelfth two thousand seven?

A. Yes sir.

Finally, Joan Walker, M.D., a family practice physician and medical malpractice panel member testified that, although she would have referred Appellant to a specialist instead of removing the foreign body with a curette or forceps, the use of the curette and the performance of the procedure, as described by Appellee, were within the applicable standard of care. Appellant has presented no evidence that the care rendered to him by Appellee fell below the applicable standard of care. Given that Appellant has the burden to prove that the treatment rendered to him by Appellee fell below the ordinary standard of care, we cannot say that Appellant has met this burden.

**CONCLUSION**

For foregoing reasons, we find a reasonable basis exists in the record for the trial court's findings. Accordingly, we uphold its judgment. We assess all costs of these proceedings to Appellant, Jerome Smith.

**AFFIRMED.**